Filed 1/25/23  P. v. Rodriguez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>LEONCIO CORONA RODRIGUEZ,<br><br>  Defendant and Appellant. | H047311<br>(Santa Clara County<br>Super. Ct. No. C1638561) |

## I.  INTRODUCTION

Defendant Leoncio Corona Rodriguez[1] was convicted by jury of five counts of committing a forcible lewd or lascivious act on a child under the age of 14 (Pen. Code, 288, subd. (b)(1)),[2] one count of aggravated sexual assault of a child under the age of 14 by sexual penetration (§§ 269, 289, subd. (a)), one count of oral copulation with a child aged 10 or younger (§ 288.7, subd. (b)), and 10 counts of aggravated sexual assault of a child under the age of 14 by oral copulation (§ 269; former § 288a).  As to each of the forcible lewd act counts, the jury found true the allegation that the offense was

---

[1] Defendant's first name is variously spelled in the record as "Leoncio" and "Leonicio."  At trial, he testified that his first name is spelled "Leoncio."

[2] All further statutory references are to the Penal Code unless otherwise indicated.

committed against more than one victim (§ 667.61, subds. (b) & (e)). The trial court sentenced defendant to an aggregate term of 255 years to life.

On appeal, defendant raises issues only as to the five forcible lewd act counts. First, defendant contends that the unanimity instruction given by the trial court misled the jury regarding the forcible lewd act counts. Second, he argues that section 667.61, which requires consecutive sentencing upon certain judicial findings, violated his Sixth Amendment right to a jury trial. Third, defendant contends that there was insufficient evidence that he used force or duress to commit two of the forcible lewd act counts against one of the victims.[3]

For reasons that we will explain, we will affirm the judgment but order clerical errors in the abstract of judgment corrected.

## II. BACKGROUND

### A. *The Prosecution's Case*

Defendant, who was born in 1963, dated and lived with the victims' mother for several years. The mother had three daughters from a prior relationship: victim G. Doe, who was the youngest daughter; victim H. Doe, who was four years older than G.; and K., who was eight years older than H. Defendant was a "father figure" to both G. and H., and their mother told the girls that they had to listen to him and respect him.

Defendant was a construction worker who worked from approximately 8:00 a.m. to 5:00 p.m., but he was able to "come and go" during the day. The victims' mother worked parttime and was usually not working in the afternoon. At times, she left G. and H. in defendant's care.

---

[3] Defendant also argued in his opening brief on appeal that there was insufficient evidence to support the multiple victim finding as to three of the five forcible lewd act counts. In his reply brief, defendant has withdrawn this argument.

### 1. Defendant's sexual abuse of H.

At the time of trial in early 2019, H. was 20 years old. H. testified that defendant started touching her when she was 10 or 11 years old and in the fifth grade. The first time it occurred, they were in bed and defendant was tickling her stomach when he "suddenly" put his hands on her breast under her shirt. After a few seconds he removed his hands and told her, "Do not tell anyone." H. felt scared.

At the end of sixth grade for H., the family moved to a different residence. H. testified that at the new residence, defendant kissed her, touched her breasts, and touched her vagina more than once. She testified that she did not want defendant to touch her body.

Regarding kissing by defendant, one night when H. was 12 or 13 years old and in the seventh grade, defendant tried to tell H. to go downstairs. H. woke up G., who shared the same bed, "to scare [defendant] away." After G. fell back asleep, defendant returned and again told H. to go downstairs. H. pretended to be asleep, but defendant knew she was awake and told her to stop pretending. H. complied because defendant was upset, and she was scared that he would hurt her. She testified that defendant "was scary." After H. went downstairs, defendant told her to get on the couch. Defendant then pulled down his pants and underwear and got on top of H. Defendant "kept on trying to make out with" her by kissing her lips. H. did not want to kiss him and did not kiss back, "[b]ut he still kept . . . kissing [her]." When someone else came down the stairs, defendant pulled up his pants and H. went back upstairs. H. testified that defendant kissed her another time while she was still in seventh grade.

Regarding defendant touching her breasts, H. testified that it occurred more than two times. She did not know whether it occurred more than five times.

Regarding defendant touching her vagina, H. testified that the first occasion occurred when she was 12 or 13 years old and in the seventh grade. Defendant told her to go to the garage. H. "had . . . an idea of what was going on" because defendant had

3

previously touched her inappropriately. H. still "listened to him" because he was her mother's boyfriend, he was an adult, and her mother had taught her to listen to adults. Defendant took her to his truck. While she was in the passenger seat and he was standing outside the truck, he pulled down her pants and underwear and put his fingers in her vagina. This was the first time he had put his fingers inside her vagina. Defendant got mad because she did not bleed. He repeatedly accused H. of already having sex, which she denied. H. wanted to leave, but defendant told her that she could not. He threatened to "do something to [her] with his [construction] tools," which were in the back of his truck. The incident ended when defendant received a cell phone call from H.'s mother, who needed a ride.

Defendant touched H.'s vagina on a second occasion when she was in seventh grade. He pulled off her pants and underwear, and then he licked her vagina. The first time that H. ever disclosed this incident was at trial.

At trial, immediately after being asked about defendant touching her breasts and vagina, H. was asked whether "[d]uring these incidents, as he was touching you, do you remember him saying anything else to you?" H. testified in response, "He would just get through and tell me not to tell anyone." When asked how she felt about being told not to tell anyone, H. testified, "I wanted to, but I just felt like I couldn't. There was too many threats going on, or that he had told me to be scared enough to not tell anyone." H. further testified that she believed her mother loved defendant and that her mother seemed happy with defendant.

## 2. Defendant's sexual abuse of G.

At the time of trial in early 2019, G. was 15 years old and in the 10th grade. G. testified that defendant started touching her when she was around eight years old and in the third grade, which would have been around the time that defendant apparently stopped touching H. G. testified that at the time defendant touched her, he was considered a "stepdad figure" to her.

4

Defendant touched her with his hands, mouth, and tongue. Defendant would take off G.'s clothes, and he used his hands and mouth to touch her breasts and vagina. G. told him to stop, and she tried to fight back and leave. However, defendant was bigger and stronger than her. The touching happened at least twice a month while she was in third grade. He put his mouth on her vagina at least 10 times that year. Defendant also rubbed his penis against her thighs and vagina one time when she was in the third grade.

G. testified that defendant continued to touch her vagina with his hands and his mouth beyond third grade. When she was nine years old and in fourth grade, he put his mouth on her vagina at least 10 times, with the incidents occurring at least three times a month. When she was 10 years old and in fifth grade, he put his mouth on her vagina at least once a month for at least 10 times that year. Similarly, when she was 11 years old and in sixth grade, he put his mouth on her vagina at least once a month for at least 10 times that year.

G. testified that the touching incidents always happened after she came home from school. G. testified that during the summer months between each of the grade levels, the touching seemed to happen more frequently. Specifically, defendant would put his mouth on her vagina and use his hands to touch her breasts almost every day during the summer.

During each of the 10 incidents at each grade level, G. would tell him, "No," but defendant did not listen to her. It made G. feel powerless.

The touching incidents occurred in different rooms, including in G.'s room, defendant's room, and in the living room. One time, G. was downstairs and defendant carried her upstairs to his room. She tried to hold on to the stair railing, but defendant pulled her, carried her upstairs, and touched her. Another incident occurred in defendant's truck in the garage when he put his mouth on her vagina and touched her breasts. In a separate incident, defendant, who was a construction worker, took her to a house that he was working on and touched her with his mouth. After one incident in

5

which defendant touched her vagina with his mouth, defendant told G. to look at him as he masturbated. At times when defendant touched G.'s body, he asked whether she liked it.

G. testified that the touching occurred when no one else was home. Although she testified that the touching usually occurred when defendant came home from work, she told the police in May 2016, that the touching usually occurred in the morning.

Defendant threatened G. in relation to the touching, and she felt scared. Although she initially testified that she could not remember what he said, she later testified that he threatened to hit her if she refused to let him touch her. H. testified that defendant would make this threat when she was "fighting back really hard." He also told her not to tell anyone. G. felt she had to listen to him. Defendant's threats to hurt her, and his demand that she not tell anyone, occurred throughout the timeframe from third to sixth grade. Defendant's statements occurred before or after the touching. More than twice defendant also told G. that "no one would probably believe" her. G. did not tell her mother about the touching because she was scared her mother would not believe her.

At trial, G. did not remember testifying at the preliminary hearing that she never saw defendant's penis and that she never saw him masturbate. G. testified that each time she talked about defendant's touching—to the police, at the preliminary hearing, and at trial—she tried to remember everything that happened and she told the truth about what she remembered. At trial, she admitted that she did not remember a lot of the details about defendant touching her. G. testified that she could not remember the details of the very first touching.

Defendant stopped touching G. when she was around 11 or 12 years old and in sixth grade or before she started seventh grade. At some point during sixth grade, she tried to avoid defendant by talking to him less, thinking he would stop.

### 3.  Events prior to H.'s and G.'s disclosures

About two months before H. and G. disclosed defendant's sexual abuse, the victims' mother noticed changes in G.  G. had always been a quiet child, but in sixth grade she "got even more quiet" and would not respond sometimes when defendant talked to her.  The mother asked G. why she was always quiet and whether defendant was scolding her, yelling at her, hitting her, or touching her inappropriately.  G. said, "No."

Also around this time, an individual, who defendant presented as his daughter, lived with the family.  Defendant's daughter was given her own room, while G., H., their older sister K., and K.'s young daughter shared a room.  G. and H. both testified that they were not angry or upset about the living arrangements.  H. admitted she was jealous that she did not have her own room, "but it wasn't a big deal" and she did not mind sharing a room with her sisters and niece.

Shortly before the disclosure of sexual abuse, defendant found H. and her boyfriend in her bedroom when they were supposed to be at school.  H. was 17 years old and a junior in high school.  Defendant was upset and pushed the boyfriend down the stairs.  Defendant told H. that he did not want her to be in a relationship and that he was going to tell her mother about it.  H. testified that defendant also told her that "when [she] turned 18, [she] was supposed to be his."  H. felt really scared.  She was also worried that she would be forbidden from spending time with her boyfriend.  At some later point, her mother disciplined her by telling her that she could not "bring the boyfriend again."

### 4.  H.'s and G.'s disclosures of the sexual abuse

Immediately after the incident in which defendant found H. and her boyfriend in a bedroom, H. left the residence and told her boyfriend what defendant had said about her turning 18 and belonging to defendant.  The boyfriend, in turn, told H.'s oldest sister, K., that defendant had been touching H.  When K. asked H. about it, H. indicated that she had been scared to disclose the conduct.

K. confronted their mother. Their mother was surprised, did not want to believe the allegations, and called H. a liar. At the same time, their mother did not believe H. was capable of lying about something so serious. The mother did not kick defendant out of the house.

K. testified that she asked G. whether defendant had touched her. G. responded, "Yes" and started crying.

K. felt "betrayed" by defendant and thereafter "avoided him." K. testified that she did not call the police, however, because she did not know what to say and "had no proof."

H. and her boyfriend decided to call the police a few days after the incident in which defendant had found the boyfriend in her room. The disclosure occurred on May 23, 2016, when H. was in 11th grade and G. was in seventh grade. H. talked to the police dispatcher for a couple of minutes. H. reported that someone had been touching her. When asked where it occurred, H. reported that it happened at her prior residence, not her current residence. She also indicated that it was her "dad" who had touched her, and she provided defendant's name.

At trial, H. explained that she was "a little distracted" during the call because her boyfriend was talking to her at the same time. She also felt the call to 911 was "overwhelming." H. denied that she had made up allegations against defendant because she was worried that he had found her at home with her boyfriend or because she was jealous of defendant's daughter having her own room.

After H. called 911, a police officer talked to her that same day at school in a private room. She reported being touched at her prior residence but indicated that most of the incidents happened at her current residence.

When H. talked to the police, she was worried that her mother would get mad and scared that her mother would get in trouble. H. also did not think her mother would believe her. H. testified that she decided to call the police with her boyfriend after

8

learning that G. had also been touched by defendant. H. "wasn't really worried about [herself]" and was "worried more for [G.]."

When G. was interviewed by the police, she referred to defendant as her stepdad. G. was initially candid and open when talking about school and similar topics, but she became more reluctant as they started discussing more traumatic points. She hunched over, looked down, and her speech was lower. At one point when the police left the room, G. started crying.

The victims' mother was in the car with defendant when he drove to the police station. Before they went inside, the mother received a call from H. who explained that she had told the police that defendant touched her inappropriately. The mother accused H. of "ripping up our family."

### 5. Expert testimony

A psychologist testified as an expert witness regarding child psychology and specifically in the area of myths and misconceptions regarding child sexual abuse victims. Common myths include that sexual abuse tends to be perpetrated by a stranger, that children will report abuse immediately, and that the child will include a lot of details when disclosing. The expert also testified that it is not unusual for a child victim to show affection to the abuser.

### B. *The Defense Case*

Defendant's friend, who was also a former coworker, testified that defendant was an honest person. Defendant had asked the friend if he could borrow $2,000. The friend provided $200 but defendant had not paid it back. The friend denied that he was motivated to testify about defendant's character or to lie in order to have the loan repaid.

Defendant had five children with his first wife. At time of trial, defendant's children—three daughters and two sons—were in their late 20's to mid-30's. The second oldest son testified that he never saw defendant "do anything inappropriately" with any of his sisters. The adult son had two daughters who were under eight years old at the time.

9

He never saw defendant "do[] anything to make [the son] believe that [defendant] would be inappropriate with them." The son believed defendant to be an honest person.

The wife of defendant's second oldest son testified that she had known defendant for about 10 years. She had never seen him "do[] something that appeared inappropriate" with her daughters, and she never felt worried about him being alone with them. She found G. and H. to be timid, shy, well-behaved girls who never showed any animosity towards defendant.

One of defendant's granddaughters, who was 17 years old at the time of trial, testified that she lived with him from January to May 2016. Defendant referred to her and introduced her as his daughter to other people. She testified that she initially slept in the living room and later moved into her own room while staying with defendant. G., H., K., and K.'s daughter all slept in one room. The granddaughter never heard G. or H. talking about her in a bad way. Defendant never said or did anything to the granddaughter that made her feel uncomfortable, and he never touched her inappropriately. According to the granddaughter, H. seemed happy and comfortable being in the same room as defendant. The granddaughter described G. as a quiet person who did not show any expressions although she was very respectful to defendant.

Defendant testified in his own behalf. At the time of trial, he was almost 56 years old. Defendant had always been heavier and taller than G. and H.

Defendant worked in construction and also had his own businesses. He usually left the house in the morning and returned in the evening around 5:30 or 6:00 p.m. He worked on weekends, too. When he came home in the evening, the victims' mother was always home with dinner ready. Defendant testified that he was very happy in his relationship with the victims' mother. He loved her daughters, G. and H., as his own. On two occasions, he took G. and H. with him to construction jobs.

Regarding the incident in which he found H. and her boyfriend in the bedroom, defendant testified that both were in their "intimate clothes." He testified that the only

10

thing he said was that "it was not right what they were doing" and that the only thing he demanded was respect. Defendant testified that he told the boyfriend to leave and that he did not touch him. When asked about his statement to the police that he had pushed the boyfriend, defendant at trial stated that he "touch[ed]" the boyfriend but did not push him. After the boyfriend left the residence, defendant told H. that "what she was doing was not right" and that when she turned 18 years old "she could do whatever she wanted." Defendant denied telling H. that she would be his when she turned 18.

Defendant was interviewed by the police on May 23, 2016. Defendant initially believed that he and the victims' mother were going to the police station to pick up G. and H. Before entering the police station, defendant and the victims' mother received a phone call from H. H. asked defendant what she should tell the police about him touching her. Defendant responded, "Tell them whatever you want. I didn't do it," and then he hung up on her. During the police interview, defendant stated that G. was very close to him, but at trial he testified that she was never close to him. In response to the police accusations, he denied raping the girls.

Defendant testified that he was never sexually interested in children and that he would never touch a child for sexual pleasure. When asked why anyone should believe him, he testified that he had been raped by two uncles when he was eight years old and that he was sexually abused by an aunt when he was around nine years old. Defendant never told the victims' mother about what happened to him and he did not recall if he disclosed it during the police interview. At trial, defendant testified that, because of what happened to him, he "hate[d] those things about sexual abuse." Defendant denied being sexually attracted to G. or H. and denied touching any part of their bodies for sexual pleasure. He testified that he loved them like daughters when he lived with them and that the charges against him were "like treason."

11

## C. *The Prosecution's Rebuttal Case*

K. first learned about defendant's sexual abuse of H. and G. on Thursday, May 19, 2016. H. and her boyfriend called the police on May 23, 2016. The police interviewed H. and G. that same day, and then interviewed defendant that night. G. reported that defendant's penis had touched her vagina and that he tried to put it in. When defendant was interviewed by the police, he denied touching or raping the victims. However, he never stated, "I would never do this because I know how it feels because I was raped as well." The police also initially only mentioned H. When the police informed defendant that there were two people making accusations, defendant brought up G.'s name.

## D. *The Charges, Verdicts, and Sentencing*

Defendant was charged by information with five counts of committing a forcible lewd or lascivious act on a child under the age of 14 (§ 288, subd. (b)(1); counts 1-3 & 16-17), one count of aggravated sexual assault of a child under the age of 14 by sexual penetration (§§ 269, 289, subd. (a); count 4), one count of oral copulation with a child aged 10 or younger (§ 288.7, subd. (b); count 5), and 10 counts of aggravated sexual assault of a child under the age of 14 by oral copulation (§ 269; former § 288a; counts 6-15). Counts 1 through 4 pertained to H., and counts 5 through 17 pertained to G. As to each of the lewd act counts (counts 1-3 & 16-17), the information alleged that the offense was committed against more than one victim (§ 667.61, subds. (b) & (e)).

On March 6, 2019, the jury convicted defendant on all counts and found true the allegation as to each of the forcible lewd act counts that the offense was committed against more than one victim (§ 667.61, subds. (b) & (e); counts 1-3 & 16-17).[4] On

---

[4] The abstract of judgment incorrectly indicates that defendant was convicted on March 9, 2019, regarding counts 11 through 15. We will order the abstract of judgment corrected to reflect that he was convicted of these counts on March 6, 2019.

May 10, 2019, the trial court sentenced defendant to consecutive terms of 15 years to life on each count, for an aggregate term of 255 years to life.

## III.  DISCUSSION

### A. *Unanimity Instruction*

Defendant contends that the jury instruction regarding unanimity "likely misled" the jury regarding the forcible lewd act counts, that is, counts 1 through 3 regarding H. and counts 16 and 17 regarding G.  Defendant contends that the prosecutor argued that multiple acts could support these counts, but the unanimity instruction given by the court "failed to connect the different approaches to specific offenses, making the instruction ambiguous."  Defendant contends that his claim of instructional error is not forfeited by his failure to raise it below.  To the extent the claim has been forfeited, he argues that his trial counsel rendered ineffective assistance of counsel.

The Attorney General contends defendant forfeited the claim by failing to raise it below, the unanimity instruction was proper, and any error was harmless.

### 1.  Background

The trial court instructed the jury regarding unanimity based on CALCRIM No. 3501 as follows:

"The defendant is charged in Counts 1 – 3 with crimes that occurred during the period of June 1, 2009 through September 1, 2012; in Count 4, with a crime that occurred from June 1, 2009 through September 1, 2012; in Count 5 with a crime that occurred from June 1, 2011 through September 1, 2012; and in Counts 6 – 17 with crimes that occurred from June 1, 2011 through September 1, 2015:

"The People have produced evidence of more than one act to prove that the defendant committed this offense.  You must not find the defendant guilty unless:

"l. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed;

"OR

13

"2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged." (See CALCRIM No. 3501.)

The jury was also instructed that it "must consider each [c]ount separately" and that the People had the burden of proving their case beyond a reasonable doubt.

During argument to the jury, the prosecutor stated that counts 1, 2, and 3 regarding a forcible lewd act on H. were based on defendant kissing her, touching her breasts, or touching her vagina. For counts 16 and 17, regarding a forcible lewd act on G., the prosecutor stated that those counts were based on defendant touching G.'s breast or her vagina. The prosecutor indicated that count 4, aggravated sexual assault, was based on defendant putting his finger in H.'s vagina and that all the remaining counts (counts 5 through 15) pertained to oral copulation of G.

The prosecutor referred to the unanimity instruction and stated the following: "There's an instruction that the Court read. And it basically explains, because we have a lot of generic testimony and a lot of multiple acts alleged here, that we have more acts that were discussed than what's actually charged. [¶] You can use that evidence in one of two ways: You can all agree that he committed at least one of those acts, . . . and you can all agree which acts he committed. [¶] And this would be applicable, for instance, to the touching. Because there was multiple testimony of touching. There was breast touch, vagina touch, and it was over the course of several years." In contrast, the prosecutor explained that for oral copulation in counts 6 through 15, "if you can all agree that he committed all of the acts alleged to have occurred during that time frame, and he committed at least a number of offenses charged, you can return guilty verdicts. [¶] Basically what that means is that we have evidence that it happened at least []96 times. We only charged 10 times. 96 is more than 10. But if you believe [G.'s] testimony that it happened more than 10 times, you can return guilty verdicts on each of those 10 times."

14

The prosecutor later reiterated that counts 1 through 3 pertained to defendant kissing H., using his hand to touch her breast, or using his hand to touch her vagina. The prosecutor stated, "So you can find three hands on the breast if you wanted to, because she testified that it happened at least three different times. Or you can find one hand on the breast, one on the vagina, and one kiss." Likewise, counts 16 and 17 were "just for the touching" of G. on her breast or her vagina.

The prosecutor further argued that when defendant "touched their body parts," he "used force, violence, duress, menace, or fear." The prosecutor explained that the jury did not need to agree on whether it was force or duress, for example, as long as they found one of the options. As an example of force, the prosecutor referred to G. being picked up and carried to a different location. Regarding express or implied duress, the prosecutor referred to defendant's threats of harm if the victim disclosed the abuse or did not let him engage in the abuse; the age and size difference between the victims and defendant; defendant was an "authority figure; and the fact that both girls "couldn't really say no" because "[i]t was going to happen anyway."

Defense counsel argued to the jury that there were problems with the testimony by H. and G. that created reasonable doubt and that defendant denied the accusations and should be found not guilty on all the charges.

## 2. Forfeiture and ineffective assistance of counsel

Defendant contends that his claim of instructional error is not forfeited by his failure to raise it below. To the extent the claim has been forfeited, he argues that his trial counsel rendered ineffective assistance of counsel.

The Attorney General contends that defendant's claim of instructional error has been forfeited and that he fails to establish ineffective assistance of counsel.

"In general, a defendant may raise for the first time on appeal instructional error affecting his or her substantial rights. (Pen. Code, § 1259; . . .) But '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus

15

needed clarification, without first requesting such clarification at trial.' [Citation.]" (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428 (*Buenrostro*).)

In this case, defendant acknowledges that the "instruction on unanimity was technically correct." He contends, however, that the trial court's "failure to connect the instruction or its different components to specific charges made the instruction ambiguous" and that counts 1 through 3, 16, and 17 must be retried as a result.

Defendant's contention is essentially that the unanimity "instruction correct in law was too general or incomplete, and thus needed clarification." (*Buenrostro*, *supra*, 6 Cal.5th at p. 428.) However, he "was obligated to request a clarifying instruction and failed to do so, thereby forfeiting [his] appellate challenge." (*Ibid.*) We therefore consider defendant's claim of instructional error within the context of whether he has established ineffective assistance of counsel based on trial counsel's failure to raise the claim below.

### 3. Unanimity

"In a criminal case, a jury verdict must be unanimous. . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) "As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty. [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*Russo*, *supra*, at p. 1132.)

The unanimity instruction given in this case was based on CALCRIM No. 3501.[5] "CALCRIM No. 3501 is an alternative instruction to CALCRIM No. 3500.[6]" (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 556.) " 'In a case in which the evidence indicates the jurors might disagree as to the particular act defendant committed, the standard unanimity instruction [(e.g., CALCRIM No. 3500)] should be given. [Citation.] But when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction [(e.g., CALCRIM 3501)] which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim.' " (*Id.* at pp. 555-556, quoting *People v. Jones* (1990) 51 Cal.3d 294, 321-322 (*Jones*).)

Regarding the "sufficiency of generic testimony," the California Supreme Court has explained that the victim "must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct,

---

[5] CALCRIM No. 3501 states: "The defendant is charged with *<insert description[s] of alleged offense[s]>* [in Count[s] ___ ] sometime during the period of ___ to ___. [¶] The People have presented evidence of more than one act to prove that the defendant committed (this/these) offense[s]. You must not find the defendant guilty unless: [¶] 1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed [for each offense]; [¶] OR [¶] 2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved that the defendant committed at least the number of offenses charged]."

[6] CALCRIM No. 3500 states: "The defendant is charged with *<insert description of alleged offense>* [in Count ___ ] [sometime during the period of ___ to ___ ]. [¶] The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

intercourse, oral copulation or sodomy).  Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping').  Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period." (*Jones*, *supra*, 51 Cal.3d at pp. 315-316.)  With respect to the requirement of unanimity, the California Supreme Court has explained that "even generic testimony describes a repeated series of *specific*, though indistinguishable, acts of molestation.  [Citation.]  The unanimity instruction assists in focusing the jury's attention on each such act related by the victim and charged by the People.  We see no constitutional impediment to allowing a jury, so instructed, to find a defendant guilty of more than one indistinguishable act, providing the three minimum prerequisites heretofore discussed are satisfied." (*Id.* at p. 321.)

" ' "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.  [Citations.]" [Citation.] " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " ' [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433.)  " 'Also, " ' "we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation].' " ' [Citation.]" (*People v. Landry* (2016) 2 Cal.5th 52, 95 (*Landry*).)

### 4.  Analysis

Defendant contends that the unanimity instruction, although "technically correct," was "ambiguous" because it "failed to connect the different approaches to specific offenses."  He argues that with respect to the forcible lewd act counts (counts 1 through 3

regarding H., and counts 16 and 17 regarding G.), some of the testimony was "specific" and some was "generic."  Because the jurors could "disagree as to which act supported each charge," defendant contends that the "[t]he jurors were required to agree on distinct acts to support counts 1, 2, 3, 16, and 17" pursuant to the standard unanimity instruction. He argues that the unanimity instruction given, however, did not make clear which instruction – standard unanimity or modified unanimity – applied to which counts and thus "[t]he most logical interpretation would be that *either* method applied to *all* 17 counts."  Based on the instruction and the fact that the jurors did not need to agree on the same theory of force for the forcible lewd act counts, defendant contends that the jury was "permit[ed] . . . to convict on all five counts if they found five separate lewd acts and any type of force, even if the testimony did not link force or duress to any particular lewd event, and they did not necessarily agree on which five acts supported the charges." Defendant argues that the error was not harmless as to counts 1, 2, 3, 16, and 17 "because the evidence did not support a finding of force for some of the incidents on which these counts could be based."

The Attorney General contends that defendant fails to show a reasonable likelihood that the jury misapplied the instruction.  The Attorney General contends that the unanimity instruction given to the jury (CALCRIM No. 3501) "required the jurors to either unanimously agree on the five specific acts supporting counts 1, 2, 3, 16, and 17, or in the alternative to unanimously agree that [defendant] 'committed *all* of the acts alleged to have occurred during this time period, and have proved that the defendant committed at least the number of offenses charged.'  [Citation.]  If the jurors disagreed about what five acts [defendant] committed, then the instruction correctly informed them to acquit [him], as such disagreement necessarily meant the jurors also did not unanimously agree that he had committed 'all' the acts."  Regarding the element of force or duress, the Attorney General argues that the "unanimity instruction did not excuse the prosecution

from its burden of proving every element of every offense beyond a reasonable doubt," "including the force or duress element for the lewd acts."

Having reviewed the unanimity instruction given by the trial court, we determine it is not reasonably likely the jury would interpret the instruction to allow them to find defendant guilty on each of the forcible lewd act counts—counts 1, 2, 3, 16, and 17—without unanimity on the particular act for each count. The jury was expressly instructed, based on CALCRIM No. 3501, that as to each "offense," "[t]he People have produced evidence of more than one act," and that the jurors "must not find the defendant guilty unless: [¶] . . . You all agree that the People have proved that the defendant committed at least one of these acts and *you all agree on which act he committed*." (Italics added.) The jury also received the alternative unanimity instruction, which also was based on CALCRIM No. 3501 and which stated, "You must not find the defendant guilty unless: [¶] . . . [¶] . . . You *all agree* that the People have proved that the defendant *committed all the acts* alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses alleged." (Italics added.) Under this alternative unanimity instruction, " 'if the jury believes the defendant committed all the acts it necessarily believes he committed each specific act [citations].' " (*Jones*, *supra*, 51 Cal.3d at p. 322.)

Defendant contends that, although the prosecutor "correctly argued" that jurors did not need to agree on the same theory of force used, the prosecutor's argument nevertheless "likely added to the confusion on unanimity regarding the *acts*, particularly in light of the prosecutor's later argument that it 'doesn't matter' which *act* the jurors find true."

We are not persuaded by defendant's argument. The jury was instructed regarding the forcible lewd act counts – counts 1, 2, 3, 16, and 17 – that the People had to prove four elements, including (1) defendant willfully touched part of a child's body; (2) in committing the act, defendant used force, violence, duress, menace, or fear; (3) defendant

acted with the requisite intent; and (4) the child was under 14 years old.  The separate unanimity instruction only addressed the first element regarding defendant's act of touching a child's body.  The unanimity instruction required jurors to all agree on the specific act forming the basis for each count, or all agree that defendant committed all the acts.  Pursuant to the instruction regarding the forcible lewd act counts, however, the jury still had to consider whether the People had proved the other three elements, including whether defendant used force or duress, had the requisite intent, and the age of the child.  The jury was further instructed that the People had the burden of proving their case beyond a reasonable doubt, and that the jury "must consider each count separately."  In view of these instructions, we do not believe there is a reasonable likelihood that the jury understood they could take a "fluid approach to the evidence" as argued by defendant and find guilt without unanimous agreement on the act for each count and without finding force or duress for each count.  (See *Landry*, *supra*, 2 Cal.5th at p. 95. [court " ' " ' "must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given" ' " ' "].)

Likewise, we are unpersuaded by defendant's reliance on *People v. Ngo* (2014) 225 Cal.App.4th 126 (*Ngo*).  Defendant refers to the prosecutor's argument in *Ngo*, in which the jury was told that it could " 'take the facts and apply them to any of the crimes as long as you all agree what act you are talking about,' and 'you can apply the acts to the different crimes if you wish . . . .' " (*Id.* at p. 153.)  In *Ngo*, unlike in this case, an erroneous unanimity instruction told the jury that it could consider criminal conduct through 2010, for a count that was charged as occurring only in 2009.  (*Ibid.*; see also *id.* at pp. 130, 147.)  In view of, among other things, the erroneous instruction and the prosecutor's argument, this court determined that the defendant was prejudiced by the erroneous instruction concerning the expanded time period forming the basis for the count.  (*Id.* at pp. 153-155.)  No such instructional error occurred in this case, and indeed

21

defendant acknowledges that the unanimity instruction in this case was "technically correct."

Accordingly, we find no merit in defendant's claim of error regarding the unanimity instruction that was based on CALCRIM No. 3501, and we also find no merit in defendant's claim of ineffective assistance of counsel based on the failure to object (see *People v. Lopez* (2008) 42 Cal.4th 960, 966 [ineffective assistance of counsel claim requires a showing of prejudice]).

## B. *Consecutive Sentencing under Section 667.61*

In convicting defendant of forcible lewd acts against H. (counts 1-3) and G. (counts 16-17), the jury also found true the allegation as to each count that the offense was committed against more than one victim (§ 667.61, subds. (b) & (e)).  Relevant to this appeal, section 667.61, subdivision (i) provides that a trial court "shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6."[7]  The probation report recommended consecutive sentences "[g]iven each count involved a separate victim or the same victim on separate occasions."  At sentencing, the trial court stated that it was adopting the recommendations in the probation report and imposed consecutive terms for counts 1, 2, 3, 16, and 17.

---

[7]  Section 667.6, subdivision (d) states in part:  "(d)(1) A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions.  [¶]  (2) In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

22

On appeal, defendant contends that "it is impossible to determine whether the jury based the verdicts on acts that occurred on separate occasions," and therefore the "court's imposition of mandatory consecutive sentences . . . rested on a judicial finding of fact." He argues that the Sixth Amendment prohibits increasing a sentence based on facts not admitted by a defendant or found true by a jury, citing *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), where the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.) As H. was the victim in counts 1 through 3, and G. was the victim in counts 16 and 17, defendant acknowledges that at least two of the counts – counts 1 and 16 – were, as the jury found, committed against more than one victim (§ 667.61, subds. (b) & (e)). He contends that the remaining three counts— counts 2, 3, and 17—could have been based on the same occasion as counts 1 or 16. Because counts 2, 3, and 17 may have been based on acts that occurred during the same occasion as counts 1 and 16, defendant contends that the trial court had the discretion to impose concurrent sentences for these counts. According to defendant, remand is required because the record reflects that the trial court did not understand that it had the discretion to impose concurrent sentences on these counts.

The Attorney General contends that "[j]udicial factfinding of the type required by section 667.61 to determine whether consecutive terms are mandatory does not violate the Sixth Amendment."

As the California Supreme Court has recognized, the United States Supreme Court in *Oregon v. Ice* (2009) 555 U.S. 160 (*Ice*) held that "*Apprendi* does not govern the decision whether to impose concurrent or consecutive sentences . . . ." (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 137.) A jury finding of multiple offenses committed at different times is not required for the imposition of consecutive sentences because "[t]he decision to impose sentences consecutively is not within the jury function

23

that 'extends down centuries into the common law.' [Citation.]" (*Ice*, *supra*, at p. 168.) The United States Supreme Court explained that the "twin considerations" of "historical practice and respect for state sovereignty . . . counsel against extending *Apprendi*'s rule to the imposition of sentences for discrete crimes. . . . [S]pecification of the regime for administering multiple sentences has long been considered the prerogative of state legislatures." (*Ibid.*)

Defendant acknowledges that California courts, including the California Supreme Court, have rejected the contention that the Sixth Amendment applies to consecutive sentencing to preclude a trial court from relying on facts that were not admitted by the defendant or found true by the jury. (See, e.g., *People v. Wilson* (2008) 44 Cal.4th 758, 809, 813 (*Wilson*) [rejecting claim that trial court violated Sixth Amendment by ordering consecutive terms under § 667.6, subd. (d) based on factors neither admitted by the defendant nor found true by the jury beyond a reasonable doubt]; *People v. Scott* (2015) 61 Cal.4th 363, 403, 405 [" 'the Sixth Amendment's restriction on judge-found facts' is 'inapplicable' when a trial judge makes factual findings necessary to the imposition of consecutive terms"]; *People v. Wandrey* (2022) 80 Cal.App.5th 962, 978-980 (*Wandrey*) [trial court's factual determination that offenses were committed on separate occasions for purposes of consecutive sentencing under § 667.6, subd. (d) did not violate the constitutional right to a jury trial], review granted Sept. 28, 2022, S275942; *People v. King* (2010) 183 Cal.App.4th 1281, 1324 [same].)[8]

Defendant nevertheless seeks to distinguish the United States Supreme Court's opinion in *Ice* on the ground that the Oregon sentencing provision at issue in that case gave the trial court the *discretion* to impose a consecutive sentence if the trial court found

---

[8] The California Supreme Court is currently considering whether the requirement of mandatory consecutive sentencing in section 667.6, subdivision (d) complies with the Sixth Amendment. (*People v. Catarino* (Oct. 14, 2021, D078832) [nonpub. opn.], review granted Jan. 19, 2022, S271828.)

a particular fact true (see *Ice*, *supra*, 555 U.S. at p. 165), whereas in this case, section 667.61, subdivision (i) *requires* the imposition of a consecutive sentence if a particular fact is found by the court. We are not persuaded by defendant's argument about a purported distinction between discretionary and mandatory consecutive sentences. As the appellate court in *Wandrey* explained, "This distinction is irrelevant: *Ice* did not turn on the fact that the statute at issue permitted, but did not require, judges to impose consecutive sentences. Rather, the court explained that 'twin considerations— historical practice and respect for state sovereignty—counsel against extending *Apprendi*'s rule to the imposition of sentences for discrete crimes. The decision to impose sentences consecutively is not within the jury function that "extends down centuries into the common law." [Citation.] Instead, specification of the regime for administering multiple sentences has long been considered the prerogative of state legislatures.' (*Ice*, *supra*, 555 U.S. at p. 168.)" (*Wandrey*, *supra*, 80 Cal.App.5th at p. 980, fn. omitted, review granted.)

Defendant also contends that the sentencing provisions found in section 667.61, not section 667.6, apply in this case. Nevertheless, he acknowledges that section 667.61, subdivision (i)'s "mandatory consecutive sentencing requirement is identical to that in section 667.6, subdivision (d)." (See §§ 667.61, subd. (i) [for specified offenses, "the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6"], 667.6, subd. (d)(1) ["A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions"].) In view of defendant's acknowledgement that section 667.61, subdivision (i) and section 667.6, subdivision (d) contain similar, mandatory consecutive sentencing requirements, and in view of the fact that the California Supreme Court has rejected the Sixth Amendment claim in the context of

25

section 667.6, subdivision (d) (*Wilson*, *supra*, 44 Cal.4th at pp. 809, 813), we likewise reject defendant's Sixth Amendment claim in the context of section 667.61, subdivision (i). (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; see also *Ice*, *supra*, 555 U.S. 160.)

Defendant seeks to rely on this court's decision in *People v. Coelho* (2001) 89 Cal.App.4th 861 (*Coelho*), in which this court (as summarized by the California Supreme Court) "rel[ied] upon the principles underlying the *Apprendi* line of decisions, [and] concluded that the provision of the Three Strikes law that *requires* a trial court to impose a *consecutive* Three Strikes sentence for each current offense of which a defendant is convicted that is 'not committed on the same occasion, and not arising from the same set of operative facts' as another current offense (§§ 667, subd. (c)(6), (7), 1170.12, subd. (a)(6), (7)) should be interpreted to require a trial court to impose consecutive sentences only where the jury expressly found (or, in light of the record, must have found) beyond a reasonable doubt that its separate convictions were based on offenses that were not committed on the same occasion and did not arise from the same set of operative facts. (*Coelho*, *supra*, 89 Cal.App.4th at pp. 874-884.) In the absence of such an explicit or implied jury finding, the court in *Coelho* held, a trial court is not *required* to impose consecutive Three Strike sentences, and must exercise its ordinary discretion in determining whether to impose consecutive or concurrent sentences. (*Id.* at pp. 884-886.)" (*In re Coley* (2012) 55 Cal.4th 524, 557, fn. omitted (*Coley*).)

As the California Supreme Court observed, our court's "decision in *Coelho*, *supra*, 89 Cal.App.4th 861, preceded the United States Supreme Court decision in *Oregon v. Ice* (2009) 555 U.S. 160, where the high court held the *Apprendi* line of decisions does not apply to factual findings that bear on the question whether multiple sentences are to be imposed consecutively or concurrently." (*Coley*, *supra*, 55 Cal.4th at p. 557, fn. 18.) The California Supreme Court in *Coley* noted that "[b]ecause the issue [was] not presented [in the case before it], [it] express[ed] no view on the validity of the holding in

*Coelho* in light of the high court's subsequent decision in *Ice*." (*Coley*, *supra*, at p. 557, fn. 18)

In this case, as we have explained, in view of the binding decisions on this court by the California Supreme Court in *Wilson*, *supra*, 44 Cal.4th at pages 809 and 813, and the United States Supreme Court in *Ice*, *supra*, 555 U.S. 160, both of which were decided subsequent to *Coelho*, defendant fails to demonstrate a Sixth Amendment violation based on the trial court's determination that counts 1 through 3, 16, and 17 involved "separate victims or involve[d] the same victim on separate occasions as defined in subdivision (d) of Section 667.6." (§ 667.61, subd. (i).)

Accordingly, we determine that defendant fails to demonstrate error in the imposition of consecutive terms on counts 1 through 3, 16, and 17.

## C. *Substantial Evidence*

At trial, the prosecutor argued that defendant used force, duress, or fear to commit three lewd acts against H. by kissing her lips, touching her breasts with his hand, and/or touching her vagina with his hand (§ 288, subd. (b)(1); counts 1-3).[9]  On appeal, defendant contends that there is insufficient evidence of force or duress as to two of the three counts, and therefore two of the three counts must be reduced to a lewd act without force under section 288, subdivision (a).  The Attorney General contends that there is substantial evidence of duress.

We determine that substantial evidence supports the finding that defendant used duress to commit three lewd acts against H.

### 1.  The standard of review

"In evaluating a claim regarding the sufficiency of the evidence, we review the record 'in the light most favorable to the judgment below to determine whether it

---

[9] The prosecutor argued that count 4, aggravated sexual assault, pertained to defendant inserting his finger inside H.'s vagina.

discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] . . . 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.]" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

### 2. Duress

Section 288 makes it a crime to commit a lewd or lascivious act on a child under the age of 14 years. (§ 288, subd. (a).) Under subdivision (b)(1) of section 288, there are additional penal consequences if the act is committed "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim." (See *People v. Soto* (2011) 51 Cal.4th 229, 233 (*Soto*).)

The "force" necessary to support a conviction under section 288, subdivision (b)(1) must be " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' [Citation.]" (*Soto*, *supra*, 51 Cal.4th at p. 242.)

Duress as used in section 288, subdivision (b)(1) means " ' "a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." ' [Citation.]" (*Soto*, *supra*, 51 Cal.4th at p. 246, italics & fn. omitted.) " ' "The total circumstances, including the age of the victim, and [her] relationship to defendant are factors to be considered in appraising the existence of duress." [Citation.]' [Citations.] 'Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family.' [Citations.]" (*People*

*v. Veale* (2008) 160 Cal.App.4th 40, 46 (*Veale*).) "A simple warning to a child not to report a molestation reasonably implies the child should not otherwise protest or resist the sexual imposition." (*People v. Senior* (1992) 3 Cal.App.4th 765, 775 (*Senior*).)

### 3. Analysis

Defendant admits that there is substantial evidence of duress and of force regarding the incident in which he kissed H. while she was on the couch. In addition to this incident, we determine that there is substantial evidence that defendant used duress to touch H.'s breast on at least two occasions. H. testified that after the first incident of him touching her breast, he told her, "Do not tell anyone." H. felt scared. She did not want defendant to touch her breasts. However, he subsequently touched her breast more than two times when she was 12 or 13 years old. During the subsequent touching, he repeated his admonition not to tell anyone and apparently made threats, causing H. to be scared. H. was still a child at the time, and defendant was more than 35 years older, as well as taller and heavier. Defendant was also the boyfriend of H.'s mother, lived with them, was a "father figure" to H., and was someone who H. had been taught to listen to. H. found defendant "scary." Based on " ' "[t]he total circumstances" ' " (*Veale*, *supra*, 160 Cal.App.4th at p. 46), including defendant's specific command to H. not to tell anyone after each touching—which "reasonably implie[d] the child should not otherwise protest or resist the sexual imposition" (*Senior*, *supra*, 3 Cal.App.4th at p. 775)—and the threats which caused H. to be scared, her young age and smaller size in relation to him, and his "father figure" status as the live-in boyfriend of her mother, we determine that there is substantial evidence from which a rational jury could infer that defendant's actions constituted an implied threat of force, violence, danger, hardship, or retribution that prompted H. to acquiesce in at least two incidents that she otherwise would not have submitted in which defendant touched her breast (subsequent to the first touching of her breast). (See *Soto*, *supra*, 51 Cal.4th at p. 246; *Veale*, *supra*, at p. 46.)

Defendant contends that "the relevant difference in age, size and authority are

the only factors that support a finding of duress in this case.  These general circumstances, which exist in virtually every incidence of molest, cannot support a finding of duress.  Just as physical force must be ' " 'substantially different from or substantially in excess of that required for the lewd act' " ' [citation], so must duress."

We are not persuaded by defendant's contention.  First, courts have recognized that when a victim is young "and is molested by her father in the family home, in all but the rarest cases duress will be present.  This conclusion does not eliminate the distinction between subdivisions (a) and (b) of section 288; those subdivisions may be violated by persons other than the child's parent or one having parental authority . . . , e.g., a 13-year-old girl . . . engag[ing] in sexual acts with her boyfriend."  (*People v. Cochran* (2002) 103 Cal.App.4th 8, 15, 16, fn. 6 [nine-year-old victim], disapproved on another ground in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12; accord, *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072-1073 [victim between the ages of four and 14 years old]; *Veale*, *supra*, 160 Cal.App.4th at pp. 46, 49 [seven-year-old victim].)  Further, as we have explained, there is evidence beyond the age and size difference and authority status of defendant in this case, specifically defendant's directive to H. not to tell anyone after each touching and the threats which caused H. to be scared.

In sum, we conclude that there is substantial evidence of duress to support defendant's three convictions for violating section 288, subdivision (b)(1) regarding H. (counts 1-3).

## IV.  DISPOSITION

The judgment is affirmed.  The abstract of judgment is ordered corrected to state that defendant was convicted on March 6, 2019, regarding counts 11 through 15.  The trial court is directed to send a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.




WE CONCUR:




_____
GROVER, J.




_____
LIE, J.




*People v. Rodriguez*
**H047311**